Approved: *Michael D. Neff*
MICHAEL D. NEFF
Assistant United States Attorney

Before:    THE HONORABLE KEVIN NATHANIEL FOX
           United States Magistrate Judge
           Southern District of New York

20 MAG 5275

- - - - - - - - - - - - - - - - -x
                                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :   Violations of
         - v. -                     :   18 U.S.C. §§ 1001, 1347,
                                    :   1028A; 50 U.S.C.
RICHARD SCHIRRIPA,                   :   §§ 4512, 4513
    a/k/a "the Mask Man,"            :
                                    :   COUNTY OF OFFENSE:
                  Defendant.        :   NEW YORK
                                    :
- - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATTHEW MACCHIAROLI, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security -- Homeland Security Investigations ("HSI") and charges as follows:

**COUNT ONE**
**(Defense Production Act -- Hoarding and Price Gouging)**

1.     Between on or about March 26, 2020 and April 10, 2020, in the Southern District of New York and elsewhere, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, knowingly, intentionally, and willfully accumulated (i) in excess of the reasonable demands of business, personal, and home consumption, and (ii) for the purpose of resale at prices in excess of prevailing market prices, materials which had been designated by the President of the United States as scarce materials the supply of which would be threatened by such accumulation, to wit, SCHIRRIPA purchased at least approximately $200,000 worth of N95 masks between February and April 2020, and sold thousands of N95 masks at severely inflated prices during both late March and April 2020, during the novel coronavirus/COVID-19 global pandemic.

(Title 50, United States Code, Sections 4512 and 4513.)

## COUNT TWO
### (False Statement to a Federal Agent)

2. On or about January 31, 2020, in the Southern District of New York, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly, falsified, concealed, and covered up by trick, scheme, and device a material fact, and did make a materially false, fictitious, and fraudulent statement and representation, to wit, SCHIRRIPA wrote a letter to the New York Division of the Drug Enforcement Administration ("DEA"), in New York, New York, in which SCHIRRIPA falsely represented, among other things, that as part of the recent closure of SCHIRRIPA'S pharmacy, he had transferred to others, sold, or destroyed all controlled substances, when in truth and fact, SCHIRRIPA remained in possession of thousands of controlled substance pills/patches, including, among other substances, fentanyl, oxycodone, oxymorphone, morphine sulfate, methadone, hydromorphone, dextroamphetamine, concerta, clonazepam, nucynta, vyvanse, and zolpidem.

(Title 18, United States Code, Section 1001(a).)

## COUNT THREE
### (False Statement to a Federal Agent)

3. On or about February 11, 2020, in the Southern District of New York, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly, falsified, concealed, and covered up by trick, scheme, and device a material fact, and did make a materially false, fictitious, and fraudulent statement and representation, to wit, SCHIRRIPA falsely told two DEA Diversion Investigators, in New York, New York, among other things, that as part of the recent closure of SCHIRRIPA's pharmacy, he had transferred to others, sold, or destroyed all controlled substances in his possession, when in truth and fact, SCHIRRIPA remained in possession of thousands of controlled substance pills/patches, including, among other substances, fentanyl, oxycodone, oxymorphone, morphine sulfate, methadone, hydromorphone, dextroamphetamine, concerta, clonazepam, nucynta, vyvanse, and zolpidem.

(Title 18, United States Code, Section 1001(a).)

2

## COUNT FOUR
### (Health Care Fraud)

4.    From at least in or about 2014 up to and including
September 10, 2019, in the Southern District of New York and
elsewhere, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant,
willfully and knowingly executed, and attempted to execute, a
scheme and artifice to defraud a health care benefit program and
to obtain, by means of false and fraudulent pretenses,
representations, and promises, money and property owned by, and
under the custody and control of, a health care benefit program,
in connection with the delivery of and payment for health care
benefits, items, and services, to wit, SCHIRRIPA caused Medicare
and Medicaid to be billed for controlled substance prescriptions,
representing that those prescriptions were for patients of his
pharmacy, when in fact, those prescriptions were not for patients
of his pharmacy, and SCHIRRIPA himself possessed those
prescriptions at his home in Long Island.

(Title 18, United States Code, Sections 1347 and 2.)

## COUNT FIVE
### (Aggravated Identity Theft)

5.    From at least in or about 2014 up to and including
September 10, 2019, in the Southern District of New York and
elsewhere, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant,
knowingly transferred, possessed, and used, without lawful
authority, a means of identification of another person, during and
in relation to a felony violation enumerated in Title 18, United
States Code, Section 1028A(c), to wit, SCHIRRIPA transferred,
possessed, used, and aided and abetted the transfer, possession,
and use of, the names and other personal identification information
of individual patients of his pharmacy to commit the health care
fraud offense charged in Count Four of this Complaint.

(Title 18, United States Code, Sections 1028A and 2.)

The bases for my knowledge and for the foregoing charges are,
in part, as follows:

6.    I have been a Special Agent with HSI for approximately
seven years.    I am currently assigned to HSI-New York's Dark
Web/Virtual Currencies Task Force.   I have been personally involved
in the investigation of this matter, along with other HSI agents
and agents or officers of the U.S. Postal Inspection Service, the
DEA, and the New York City Police Department.    This affidavit is

based upon my investigation, my conversations with others including other law enforcement agents, and my examination of reports, records, and other evidence. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. All dates are approximate.

## OVERVIEW

7.     As set forth in greater detail below, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, engaged in at least three different criminal schemes:

a.     First, from at least late March to April 2020, during the COVID-19 global pandemic, SCHIRRIPA engaged in hoarding and price gouging of thousands of 3M N95 masks. Between February and April 2020, he purchased at least approximately $200,000 worth of N95 masks. On March 25, 2020, the Defense Production Act was invoked, making it a crime to engage in hoarding or price gouging of specified equipment, including the types of masks SCHIRRIPA had. SCHIRRIPA admitted to law enforcement that he was aware of this law. Nevertheless, in the two weeks after March 25, 2020, SCHIRRIPA (1) obtained an additional $40,000 worth of N95 masks, and (2) charged his customers severely inflated prices in connection with at least approximately 50 sales, through which he charged them at least approximately $50,000. For instance, SCHIRRIPA charged up to $25 per mask for a mask which should have cost an end-user only approximately $1.27. During a recorded call with an undercover agent, SCHIRRIPA said, "We're in a time of emergency and shortage," but added, "when you have something no one else has, it's not a high price."

b.     Second, in both January and February 2020, SCHIRRIPA made a material false statement to the DEA. On each occasion, SCHIRRIPA falsely represented that as part of the recent closure of his pharmacy, he had transferred to others, sold, or destroyed all controlled substances. In fact, SCHIRRIPA remained in possession of thousands of controlled substance pills/patches, including fentanyl, oxycodone, oxymorphone, morphine sulfate, methadone, hydromorphone, dextroamphetamine, concerta, clonazepam, nucynta, vyvanse, and zolpidem. These substances were all recovered from a safe in SCHIRRIPA's home.

4

c.     Third, SCHIRRIPA caused Medicare and Medicaid to be billed for these controlled substance prescriptions, and he falsely represented that these prescriptions were for patients of his pharmacy. In fact, these prescriptions were not for patients of his pharmacy, and SCHIRRIPA himself possessed those prescriptions at his home in Long Island. In connection with this scheme, SCHIRRIPA used the personal identifying information of his pharmacy's patients, without their authorization.

## **RICHARD SCHIRRIPA'S HOARDING AND PRICE GOUGING SCHEME**

### The COVID-19 Pandemic and the Defense Production Act

8.     Based on my review of publicly available information, I am aware that, in late 2019, a novel coronavirus, SARS-CoV-2 (the "coronavirus"), was first detected in Wuhan, China, causing outbreaks of the coronavirus disease COVID-19 that have since spread globally. COVID-19 is highly contagious and causes severe acute respiratory syndrome. In total, COVID-19 has infected more than approximately 4.8 million individuals worldwide and caused more than approximately 320,000 deaths.

9.     On or about January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a national public health emergency under 42 U.S.C. § 247d as a result of the spread of COVID-19 to and within the United States. On or about March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic. On or about March 13, 2020, the President of the United States issued Proclamation 9994 declaring a national emergency, as a result of the rapid spread of COVID-19 within the United States.

10.     The Centers for Disease Control and Prevention has issued guidance to health care providers recommending that they wear personal protective equipment ("PPE") to prevent the coronavirus from being transmitted by infected patients to healthcare providers. As COVID-19 spreads in the New York Metropolitan area and across the United States, it threatens to overwhelm hospitals and healthcare providers who are required to care for rapidly increasing numbers of seriously ill patients with a rapidly dwindling stock of PPE and other necessary health and medical resources. Accordingly, on March 18, 2020, the President of the United States issued Executive Order 13909, *see* 85 Fed. Reg. 16,227, invoking the powers vested in the President by the Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.* (the "DPA").

11. The DPA authorizes the President to, among other things, "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The President may exercise this authority "to control the general distribution of any material in the civilian market" if the President finds "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." 50 U.S.C. § 4511(b).

12. "In order to prevent hoarding," the DPA further provides that "no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation." 50 U.S.C. § 4512. The DPA requires the President to publish in the Federal Register "every designation of materials the accumulation of which is unlawful and any withdrawal of such designation," and authorizes the President to "prescribe such conditions with respect to the accumulation of materials in excess of the reasonable demands of business, personal, or home consumption as he deems necessary to carry out the objectives of this chapter." *Id.*

13. In Executive Order 13909, the President found that "health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators, meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b))." The President further delegated authority to the Secretary of HHS to "identify additional specific health and medical resources that meet the criteria of section 101(b)."

14. On or about March 23, 2020, the President issued Executive Order 13910, *see* 85 Fed. Reg. 17,001, declaring it "the policy of the United States" that health resources needed to respond to the COVID-19 pandemic not be hoarded. Such resources included "personal protective equipment." Accordingly, the President delegated to the Secretary of HHS the President's authority under 50 U.S.C. § 4512 "to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States," and "to implement any restrictions on hoarding."

6

15. On March 25, 2020, the Secretary of HHS exercised this authority, delegated by the President, to prevent the hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States. The Secretary of HHS published a notice, *see* 85 Fed. Reg. 17592, designating N95 Filtering Facepiece Respirators, among other health and medical resources, under the DPA as scarce materials or materials the supply of which would be threatened by accumulation in excess of reasonable demands of business, personal, or home consumption, or for the purpose of resale at prices in excess of prevailing market prices (the "HHS Notice").

16. The Defense Production Act makes the willful performance of any act prohibited by § 4512, "or any rule, regulation or order thereunder," a crime punishable by a fine of not more than $10,000 or imprisonment for not more than one year. 50 U.S.C. § 4513. Accordingly, willfully accumulating designated scarce or threatened materials either (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, is a criminal offense.

### Defendant RICHARD SCHIRRIPA

17. Based on my involvement in this investigation, including my review of the New York State Education Department website, I am aware that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, is a licensed pharmacist. He became licensed on or about December 21, 1979; his license is active until in or around January 2022.

18. Based on my involvement in this investigation, including my review of New York State Department of State incorporation records and my participation in an interview of the defendant (discussed below), I am aware that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, was the Chief Executive Officer of a pharmacy in New York, New York -- Madison Avenue Pharmacy, Inc. ("MAP") -- until he sold this pharmacy less than one year ago.

19. In or around early April 2020, HSI received a tip that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, was allegedly selling bulk PPE at inflated prices throughout the New York area. This PPE reportedly included thousands of surgical N95 masks used in the medical field. The individual who supplied the tip provided SCHIRRIPA's phone number (the "SCHIRRIPA Phone Number").

## The April 4, 2020 Undercover Call to RICHARD SCHIRRIPA

20. On or about April 4, 2020, another HSI Special Agent, acting in an undercover capacity (the "UC"), placed a recorded telephone call to RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant at the SCHIRRIPA Phone Number.[1] During the recorded call, which lasted longer than ten minutes, SCHIRRIPA and the UC discussed a transaction involving masks. SCHIRRIPA said that the surgical grade N95 masks were available for sale for $22 per mask, while the commercial grade N95 masks were available for sale at a price of $150 for ten masks (i.e., $15 per mask). During the call, SCHIRRIPA said the following, in sum and substance, and among other things:

- "I had purchased them after the gouging took place, so the price -- my masks are very expensive, but you can't get them."

- "The masks I have, I bought prior to the outbreak in the US. When it hit China, I went out to get large quantities and unfortunately I paid very high for them, but you know something, when you have something no one else has, it's not a high price."

- "I used to sell a box of these for like $20, now it's like $15 a mask."

- "We're in a time of emergency and shortage."

- "I'd like to just do it one shot. You need one box? Fine. You need ten boxes? Fine. I just want to do it in one shot."

- "I have a very large quantity. I spent over $200,000 on masks."

---

[1] The investigation has confirmed that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, used the mobile telephone device associated with the SCHIRRIPA Phone Number. Among other things, in addition to SCHIRRIPA identifying himself as "Rich" and "Rich Madison Avenue Pharmacy" during calls with the UC, a mobile telephone device was later seized from SCHIRRIPA, which was searched on SCHIRRIPA's written consent, which confirmed that it was associated with the SCHIRRIPA Phone Number.

- Referring to Mt. Sinai Hospital: "It's a freaking war zone. It's fucking crazy."

- "The bottom line is that if you get an order together, I will bring some extra ones to the city. If you find out your quantity, just give me an idea so I can know how many to bring. I can only fit a thousand masks in my car. And I got a lot of . . . shit, I gotta bring a thousand for a nursing home tomorrow."

- "[F]ind out how many you need and include anyone over 60 relative wise, and essential workers like nurses, and any of your girlfriend's affiliates or associates and . . . text me your name and address so I can generate a bill. So I would rather just sell them to you, and you sell it to them at the price I give you. If you can do that then I have no problem because I don't want any price gouging associated with this."

- "My name is Rich, Madison Avenue Pharmacy."

- "I'm a pharmacist. My pharmacy license is still active."[2]

Based on my training, experience, and involvement in this investigation, I am believe that, during this recorded call, SCHIRRIPA:

    a.    Expressed keen awareness of the concept of price gouging (*"I had purchased them after the gouging took place"; "I don't want any price gouging associated with this."*);

    b.    Stated that he had a very large quantity of PPE, including masks (*"I went out to get large quantities"; "I have a very large quantity.   I spent over $200,000 on masks."*);

    c.    Admitted that he bought a large quantity after COVID-19 emerged in China, but before it arrived in the United States (*"The masks I have, I bought prior to the outbreak in the US. When it hit China, I went out to get large quantities"*);

---

[2] During this recorded UC call, "Rich" also asked the UC if the UC was an essential worker and informed the UC -- who claimed to work in "Fintech" doing essentially IT work -- that IT communications was "essential."

9

d. Admitted that his prices were extremely high compared to typical market price ("*I used to sell a box of these for like $20, now it's like $15 a mask*");

e. Expressed his awareness of the present health crisis ("*We're in a time of emergency and shortage*"; "*It's a freaking war zone*" at Mt. Sinai Hospital); and

f. Asserted that he could charge a premium because of the shortage of supply ("*when you have something no one else has, it's not a high price*").

## Physical Surveillance of SCHIRRIPA on April 6 and 7, 2020

21. Based on my involvement in this investigation, including my conversations with other law enforcement agents and officers, I am aware that law enforcement (including myself) conducted physical surveillance of RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, on April 6 and 7, 2020, during which time agents repeatedly observed SCHIRRIPA engage in hand-to-hand transactions consistent with his bulk sale of PPE, including in Manhattan. Often, SCHIRRIPA sold boxes of apparent PPE on the street out of the trunk of his car.

## SCHIRRIPA's Sale of PPE to the UC on April 9, 2020

22. Based on my involvement in this investigation, including my conversations with other law enforcement officers, I know that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, met with the UC on April 9, 2020 on Madison Avenue in the vicinity of 97th and 98th Streets. This meeting was recorded. Based on my conversation with the UC, I understand that the following transpired, among other things:

a. SCHIRRIPA sold approximately 16 boxes of N95 masks to the UC for a total price of approximately $2,690. Specifically, SCHIRRIPA sold (1) 15 boxes of N95 commercial grade masks (referred to as 8511s) for $150 per box (each box has 10 masks), and (2) one box of N95 surgical grade masks (referred to as 1860s) for $440 for a box of 20 masks. Thus, SCHIRRIPA charged the UC $15 per N95 8511 (commercial grade) mask, and $22 per N95 1860 (surgical grade) mask.

b. At first, SCHIRRIPA and the UC were parked on opposite sides of Madison Avenue. The UC walked over to SCHIRRIPA, and SCHIRRIPA told the UC to drive around the block and pull up

10

next to SCHIRRIPA's car. SCHIRRIPA added, in sum and substance and in part, "I don't want anyone to see the stuff -- this stuff is like gold right now, someone's gonna break into my car."

c. At one point during their conversation, SCHIRRIPA said, unprompted, in sum and substance: "I feel like a drug dealer standing out here."

d. At another point during their conversation, SCHIRRIPA said that his supplier is in Florida. He added that the wholesalers who provided these masks to his supplier are price gouging, and he implied that these masks were originally obtained on "the black market."

e. SCHIRRIPA said that he normally buys the surgical grade masks for $20 per box and sells them for $40, but he said he had purchased these for $400 per box.

f. The UC was able to see into SCHIRRIPA's car, which was packed with boxes in both the backseat and the trunk.

g. SCHIRRIPA supplied an invoice for the purchase, which referenced his office address within 1410 Madison Avenue, New York, New York 10029 ("SCHIRRIPA's Apartment").

h. As for payment, the UC attempted to complete a Venmo transaction, but the transaction would not go through (potentially because the dollar amount was too large).[3] SCHIRRIPA told the UC to pay him by that evening, and the UC agreed (and was permitted to keep the boxes of PPE). Later that day, the UC again met up with SCHIRRIPA and paid him $2,690 in cash for the 16 boxes of N95 masks; this meeting, too, was recorded.

### The April 10, 2020 Interviews of SCHIRRIPA and His Relative

23. Based on my involvement in the execution of judicially authorized search warrants on April 10, 2020 (discussed below), I am aware that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, voluntarily agreed to be interviewed by law enforcement agents, including myself. This April 10, 2020 interview took place at SCHIRRIPA's residence on Long Island. During this interview, SCHIRRIPA said the following, in sum and substance and in part:

---

[3] Venmo is a mobile payment service that allows users to transfer funds to others electronically, using a cellphone application or web browser.

11

a. SCHIRRIPA knew that law enforcement was going to come to his home.

b. SCHIRRIPA was aware of the Defense Production Act and its price gouging and hoarding provisions.

c. SCHIRRIPA had bought 14,000 N95 masks from a particular distributor.

d. SCHIRRIPA was marking up some of the masks by 50%. For some masks, his markup was 10% ($20 to $22 per mask); for other masks, his markup was 50% ($10 to $15 per mask).

e. SCHIRRIPA had sold thousands of masks in the preceding few days.

f. SCHIRRIPA made a profit on selling the masks -- specifically, 10% to 33% profit per mask.

g. When asked about the fact that he was selling a box of surgical-grade N95 masks for $440, SCHIRRIPA said he could sell them for $800 (per box of 20) and people would pay because they need them.

h. SCHIRRIPA had spent $120,000 on masks.

i. Others had nicknamed him "the Mask Man."

j. He was eager for China to reopen, because he was going to continue selling masks and he intended to buy more masks from China at an approximate price of $5 per box.

24. Based on my involvement in this investigation, including the execution of a search warrant at the Long Island residence of RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, I am aware that SCHIRRIPA's relative ("Relative-1") -- who appeared to live in that residence, as well -- voluntarily agreed to be interviewed by other law enforcement agents that day. During that interview, Relative-1 said, in sum and substance and in part, that SCHIRRIPA's pharmacy started losing revenue about ten years ago, and that SCHIRRIPA had used his personal savings to cover business expenses and keep his pharmacy open.

April 10, 2020 Searches of SCHIRRIPA's House, Apartment, and Car

*6,660 N95 Masks*

25.   Based on my involvement in this investigation, including my conversations with other law enforcement officers, I know that several judicially authorized search warrants were executed on April 10, 2020 -- specifically, warrants for (1) defendant RICHARD SCHIRRIPA's Long Island, New York residence ("SCHIRRIPA's House"); (2)   SCHIRRIPA's   New   York,   New   York   apartment   (SCHIRRIPA's Apartment); and (3) SCHIRRIPA's Audi vehicle ("SCHIRRIPA's Car"). In executing these search warrants, law enforcement seized a total of approximately 6,660 N95 masks from these three locations: 5,760 from SCHIRRIPA's House, 410 from SCHIRRIPA's Apartment, and 490 from SCHIRRIPA's Car.

*Thousands of Pills of Controlled Substances*

26.   Based on my involvement in this investigation, including my participation in the execution of the judicially authorized search warrant of SCHIRRIPA's House, I am aware that, among other things, various controlled substances were found inside of a safe in   the   basement,   including   fentanyl   patches,   oxycodone, oxymorphone, morphine sulfate, hydromorphone, dextroamphetamine, methadone, concerta, clonazepam, zolpidem, and nucynta.   In total, there were approximately 3,958 patches/pills in this safe.[4]   The prescription labels on these bottles were in other people's names; none had the name of RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, or the name of his cohabitant.

27.   In speaking with law enforcement on April 10, 2020, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, told agents in sum and substance, and among other things, that this safe in the basement contained narcotics from his pharmacy and he knew he needed to destroy them.

*Documentary Evidence*

28.   Based on my involvement in this investigation, including my participation in the execution of search warrants and the subsequent review of evidence, I am aware that documents seized from SCHIRRIPA's House and SCHIRRIPA's Apartment revealed the following, among other things:

---

[4] In addition, SCHIRRIPA's Apartment contained, among other things, nearly 200 pills of Hydroxychloroquine or Hydroxychloroquine sulfate, which are also designated in the HHS Notice.

13

a.  Folders: SCHIRRIPA had various folders, labeled (among other things) "Price Gouging," "N95," "N95 New Orders," "3M Inventory," "Invoices 3M and PPE," "Purchases PPE," "PPE Paid Bills," and "Bank Info."

b.  Handwritten Notes: Hand-written notes within the "N95 Masks" folder list what appear to be various different manufacturers and models of PPE, such as "3M 1860, 1870, 9132," "Du Pont Tyvex 600 800," "Halyard: 46767 46867," "ViroGuard 2 Heave Duty," "Lakeland Microgard 3M," "Medline," etc. These handwritten notes also include, in some instances, notations regarding pricing and FDA approval.

c.  SCHIRRIPA's PPE Purchases: Invoices reflecting the purchase of face masks, including N95 masks, from at least three different suppliers during 2020.

i.  One invoice, dated on or about February 13, 2020, appears to show that SCHIRRIPA purchased approximately $229,175 worth of face masks -- including 3M 8210 N95 masks -- from a particular supplier with operations in New Jersey ("Supplier-1").[5]

ii.  Another invoice, dated on or about February 19, 2020, appears to show that SCHIRRIPA purchased approximately 20 3M 1860S surgical masks for a total of $299.95 from a particular e-commerce supplier with operations in Texas ("Supplier-2").

iii.  Invoices and additional documents reveal that, in or around February 2020, SCHIRRIPA purchased a total of approximately $200,000 worth of N95 masks from a particular supplier based in Mississippi ("Supplier-3"). SCHIRRIPA paid approximately $10 per mask for thousands of N95 8511 masks, and approximately $20 per mask for thousands of N95 1860 (and 1860S) masks.

d.  Sales Ledger: An apparent sales ledger, entitled "3M N95 Total Sales," revealed nearly 50 mask transactions between approximately March 26, 2020 and April 6, 2020; in connection with these sales, SCHIRRIPA charged customers his approximately $50,000 in total. This sales ledger generally matched SCHIRRIPA's customer-by-customer invoices, discussed below.

---

[5] SCHIRRIPA later informed agents that this particular transaction did not go forward.

e.      Sales Invoices: Various apparent sales invoices confirmed the date, quantity, price, and recipient for each of SCHIRRIPA's sales of N95 masks. Each invoice included the name of SCHIRRIPA's pharmacy -- the same pharmacy he had already closed.

i.      *Customers*: SCHIRRIPA's customers were located in eight states including New York, including some with Manhattan addresses.

ii.     *Prices*: SCHIRRIPA's prices varied depending on the customer, but he consistently charged more than he had paid for the N95 masks; his prices ranged from approximately $21 to $25 per mask for an N95 1860 mask, and from approximately $11 to $15 per mask for an N95 8511 mask.[6]

iii.    *Specific Invoices*:    Examples  of  invoices include the following:

1.      An invoice dated April 8, 2020, in which SCHIRRIPA charged $22 per N95 1860 mask, which masks were sent to two doctors in New York, New York, for a total of $2,200 for 100 masks.

2.      An invoice dated April 5, 2020, in which SCHIRRIPA charged an individual in Commack, New York $25 per N95 1860 mask, for a total of $500 for 20 masks.

3.      An invoice dated April 5, 2020, in which SCHIRRIPA charged a funeral home in Huntington Station, New York $15 per N95 8511 mask, for a total of $1,200 for 80 masks.

4.      An invoice dated April 5, 2020, in which SCHIRRIPA charged a doctor in New York, New York $22 per N95 1860 surgical mask and $15 per 8511 mask, for a total of $590 for 30 masks.

5.      An invoice dated April 3, 2020, in which SCHIRRIPA charged a funeral home in Northport, New York $15 per N95 8511 mask, for a total of $1,500 for 100 masks.

---

[6] As discussed below, according to a 3M representative, the suggested retail price for an end-user is $1.27 for an N95 1860 mask (not up to $25), and $2.45 to $3.11 for an 8511 mask (not up to $15); SCHIRRIPA therefore charged up to approximately 20 times what an end user should pay.

15

6.     An invoice dated April 3, 2020, in which SCHIRRIPA charged a medical rehabilitation center in Brooklyn, New York $22 per N95 1860 surgical mask and $15 per N95 8511 mask, for a total of $890 for 50 masks total.

7.     Two invoices dated April 1, 2020, in which SCHIRRIPA charged a drug store in Northport, New York $22 per N95 1860S mask and $15 per N95 8511 mask, for a total of $5,200 for 300 masks total.

f.     Letter from 3M: SCHIRRIPA's folder contained an apparent letter from 3M, dated January 1, 2008, addressed to its "Valued Customer," which explained differences between its various "N95 particulate respirators," including 1860/1860S models.

g.     Articles: SCHIRRIPA's folders contained articles about the COVID-19 pandemic, including the following:

i.     An article entitled "A comprehensive timeline of the new coronavirus pandemic, from China's first COVID-19 case to the present," which included a timeline of major events in the spread of the pandemic.     The article was annotated with red asterisks marking two dates on that timeline: the first COVID-19 death in China, and the first COVID-19 death in the United States.

ii.     An article dated April 2, 2020 entitled, "'It is impossible for us to stop the spread': Nursing homes overwhelmed by coronavirus".

### SCHIRRIPA's Cellphone

29.     Based on my involvement in this investigation, I am aware that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, consented verbally and in writing to a search of his cellphone, which revealed the following, among other things:

a.     Text messages with PPE customers;

b.     Photographs of N95 masks;

c.     A photograph of the UC;[7]

---

[7] During the April 10, 2020 interview, SCHIRRIPA told agents, in sum and substance and in part, that he had taken this photograph of the UC "just in case I have to find him and go kick his ass."

16

d.     Text  messages  with  a  sales  representative  of
Supplier-3 ("Sales Rep-1"), including the following messages:

> **Sales Rep-1:** Wanna bet by this time next month these
> will be going for $100 per mask / Couple thousand
> more people will pass and these things are gonna be
> nowhere to be found

\*   \*   \*

> **Sales Rep-1:** when you can, can you please email me
> over  a  referral  email,  stating  you  have  a
> connection with [] hospital and we will be working
> together to service them with masks . . . And we
> get one step closer to getting your ass retired

\*   \*   \*

> **Sales Rep-1:** Let's flip this shit and make stupid
> money

\*   \*   \*

> **SCHIRRIPA** (3/26/2020): Important. Please call me
> . . . I have a contact that has a 3M contract and
> can get lg quantities of 1860 within 3 days.

e.     Text  messages  with  customers  and  potential
customers, including one dated on or about April 2, 2020, in which
SCHIRRIPA wrote, in sum and substance and in part, that he was
selling "N95 Respirators"; he had sold thousands and still had
thousands available for sale; and he bragged that he "[s]aw it
coming" and the "good thing is no one has them".

f.     Web browser history that includes various articles
about the COVID-19 pandemic and price gouging, including articles
with the following titles, among others:

- Coronavirus   price   gouging:   PIX11   visits
  Manhattan drug store hit with fine (3/26/2020)

- United States Coronavirus: 64,832 Cases and 913
  Deaths – Worldometer (3/25/2020)

- Coronavirus Update (Live): 466,752 Cases and
  21,148 Deaths from COVID-19 Virus Outbreak –
  Worldometer (3/25/2020)

- A Timeline of the Coronavirus Pandemic – The New York Times (3/25/2020)

- Cuomo Slams Feds for COVID-19 Ventilator Shortage: 'You Pick Who Dies' – NBC New York (3/24/2020)

- Stores Try to Protect Customers During Coronavirus Pandemic – NBC New York (3/24/2020)

- Emergency Rule: Price Gouging is Illegal (3/17/2020)

- Price spikes on coronavirus-related products prompt price gouging concerns – abc7ny.com (3/10/2020 and 3/12/2020)

## Further Accumulation of N95 Masks after the HHS Notice

30. The investigation has revealed that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, continued to accumulate and add to his stockpile of N95 masks, following the HHS Notice that was issued on March 25, 2020. Specifically, based on my involvement in this investigation, including my review of documents and reports, and my interview of the defendant, I am aware of the following, among other things:

a. As to one purchase of N95 masks from Supplier-3, SCHIRRIPA's business partner ("CC-1") received an $80,000 invoice from Supplier-3, paid it fully, and received all of the masks. A wire transfer shows a $40,000 transfer, on or about March 20, 2020, from Madison Avenue Pharmacy's bank account to CC-1's pharmacy's bank account. In light of this payment, SCHIRRIPA acknowledged during his interview that he took possession of half of those N95 masks and CC-1 remained in possession of his half of the masks.

b. In an interview on or about April 10, 2020, CC-1 informed law enforcement that he was unable to sell any of his masks. CC-1 told SCHIRRIPA that hospitals said the price was too high and would not buy them. Accordingly, CC-1 eventually sold his half to SCHIRRIPA.

c. During the April 10, 2020 interview of SCHIRRIPA, SCHIRRIPA confirmed this by stating, in sum and substance, that he had recently bought out CC-1 for $40,000 for his share of the N95 masks and recently taken possession of those masks.

18

d.      Documents recovered during the April 10, 2020
search of SCHIRRIPA's Apartment confirm that he acquired CC-1's
share of the N95 masks after March 25, 2020.    Specifically,
handwritten notes recovered from his Apartment indicate, "[CC-1]
→ Rich 4/6/2020," and include "1860S," "1860," "boxes," and
various quantities.   A second wire transfer also shows a $40,000
transfer, on or about April 8, 2020, from Madison Avenue Pharmacy's
bank account to CC-1's pharmacy's bank account.    Accordingly, I
believe SCHIRRIPA bought thousands of additional N95 masks between
on or about April 6, 2020 and April 8, 2020.

## Interview of a 3M Representative

31.   Based on my involvement in this investigation, including
my  review  of  a  report  of  interview,  I  am  aware  that  a
representative of 3M agreed to a voluntary interview with law
enforcement on or about May 5, 2020, and said the following, in
sum and substance and in part:

a.      3M has not altered its prices due to the COVID-19
pandemic.

b.      3M has not altered its prices since the beginning
of the COVID-19 pandemic, except for minor, previously scheduled
price increases that affected wholesalers and would amount to
"cents or pennies" to end users/customers.    This minor price
adjustment, which is routine, was due to standard financial
factors, not the pandemic.

c.      Two popular, widely distributed types of N95 face
masks are 1860 and 8511.    3M N95 1860 masks are surgical-grade
face masks, and 3M N95 1860S masks are simply "small" 1860 masks.
3M 8511 face masks are not surgical-grade.

d.      For either an N95 1860 or an N95 1860S face mask,
an end-user should pay $1.27.

e.      For an N95 8511 face mask, an end-user should pay
between $2.45 and $3.11.

f.      He referred law enforcement to a 3M website, which
notes, in part, that the "[a]ctual prices may be lower" than even
these "list prices."[8]

---

[8] *See* 3M, *Fraudulent  Activity,  Price  Gouging,  &  Counterfeit
Products*,      April      8,      2020,      *available      at*

19

## **SCHIRRIPA'S FALSE STATEMENTS TO THE DEA**

### 2009 and 2015 Inspections of SCHIRRIPA's Pharmacy

32.  Based on my review of publicly available information and DEA reports, I am aware that, in or around 2009, the DEA conducted a routine inspection of MAP, which was fully owned by RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant. This inspection revealed various violations of Title 21, leading to a federal civil case.[9] In or around 2013, SCHIRRIPA and MAP settled this case with the U.S. Attorney's Office in the Southern District of New York. As part of the settlement, SCHIRRIPA and MAP admitted responsibility for numerous violations of the Controlled Substances Act (the "CSA") between February 2007 and July 2009, and agreed to pay $200,000 in civil penalties and to implement enhanced compliance procedures.[10] As part of the 2013 settlement, SCHIRRIPA agreed to install a Compliance Officer at MAP, who required pre-approval by the DEA, for a period of five years.

33.  Based on my conversations with a DEA employee, as well as my review of DEA records and reports, I am aware that on or about March 24, 2015 (during the five-year term of the Compliance Officer), a DEA inspection of MAP revealed that MAP failed to maintain an accurate inventory, in violation of Title 21, Code of Federal Regulations ("CFR"), Section 1304.11(a). During that inspection, DEA audited five drugs. For one of those five

---

https://multimedia.3m.com/mws/media/1803670O/fraudulent-activity-price-gouging-and-counterfeit-products.pdf.

[9] The civil case was filed in this District under the caption *United States v. Richard Schirripa*, 12 Civ. 610 (MHD).

[10] Specifically, SCHIRRIPA and MAP admitted the following violations of the CSA: SCHIRRIPA allowed dispensing pharmacists at MAP to order Schedule II controlled substances using his private access key, rather than requiring them to obtain and use their own keys; he and the pharmacy did not utilize the relevant software to electronically reconcile orders of Schedule II controlled substances; MAP was not maintaining a complete and accurate record of the pharmacy's supply of OxyContin at the time of the DEA audit; SCHIRRIPA and MAP failed to conduct a timely biennial inventory in 2009; and SCHIRRIPA and MAP did not timely report the loss of OxyContin to the DEA; and SCHIRRIPA did not use the relevant software to produce the electronic DEA Form 222 order forms when so requested by the DEA.

controlled substances, Oxycodone 30mg pills, MAP had a shortage of approximately 191 pills (when comparing physical inventory to pharmacy records). For three of those five controlled substances -- hydrocodone, methadone, and endocet -- MAP had an overage (when comparing physical inventory to pharmacy records). On or about April 20, 2015, DEA sent a formal Letter of Admonition to RICHARD SCHIRRIPA, the defendant, noting this failure. In a letter dated on or about May 14, 2015, SCHIRRIPA wrote to the DEA stating that, in sum and substance and in part, MAP acknowledged violating 21 CFR § 1304.11(a) and had taken corrective action.

## 2020 Attempted Audit of MAP

34. Based on my conversations with a DEA employee, as well as my review of DEA records and reports, I am aware of the following, among other things:

a. According to federal regulations, before a pharmacy "discontinue[s] business activities," that pharmacy is required to notify DEA "at least 14 days in advance." 21 CFR § 1301.52. Among other things, this requirement helps ensure that the DEA is aware of situations in which large quantities of dangerous substances are likely to be transferred or sold. SCHIRRIPA did not comply with this regulatory requirement.

b. On or about January 28, 2020, two DEA Diversion Investigators attempted to conduct a routine audit of MAP. However, upon arriving at the (only) address of record for MAP, the pharmacy appeared to be closed, and the Diversion Investigators saw a piece of paper on the storefront that stated, in substance and in part, that the pharmacy was no longer in business and that its controlled substances had been transferred to a specified local pharmacy. As a result, DEA was unable to conduct an audit of MAP. Before this attempted audit, DEA was not aware that MAP had closed. The two Diversion Investigators then went, in person, to the local pharmacy that was specified, on MAP's storefront, as the purchaser of MAP's controlled substances. Shortly thereafter, RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, called the DEA.

c. On or about January 31, 2020, SCHIRRIPA wrote a signed letter to the New York Division of the DEA, in which he stated, in sum and substance and in part, the following (emphasis added):

i. "I am the sole shareholder of Madison Avenue Pharmacy Inc."

21

ii. "I am submitting [MAP]'s DEA Registration Certificate for retirement at this time, as [MAP] is no longer in business. . . . **Back on September 9, 2019, we closed down the pharmacy operations of [MAP] and sold** the majority of the assets, prescription records and the non-controlled and **controlled prescription drugs to a local Duane Reade Pharmacy.**"

iii. "During the ensuing time after September 9, 2019, [MAP] was selling off the over the counter products, as well as sorting out and **packing up the remaining various expired pharmaceutical products, which needed to be returned to a reverse distributor,** and processed for credit."[11]

iv. "[MAP] is now totally closed down and all over the counter drugs and sickroom supplies have been sold and **all pharmaceutical products have been returned for credit via our reverse distributor.** Therefore, upon receipt of this letter we would appreciate your retiring the DEA number for Madison Avenue Pharmacy Inc."

As explained below, I believe each bolded statement in this January 31, 2020 letter was deliberately false.

d. On or about February 11, 2020, a meeting took place at the office of SCHIRRIPA's attorney, located in New York, New York. Four individuals attended this meeting: SCHIRRIPA, his attorney, and the two aforementioned DEA Diversion Investigators. During this meeting, SCHIRRIPA told the two DEA Diversion Investigators the following, in sum and substance and in part:

i. All Schedule II through V controlled substances were sold and transferred to Walgreens Corporation, doing business as Duane Reade.

ii. He had returned Schedule II controlled substances to two particular suppliers, which he named.

---

[11] To "reverse distribute" means "to acquire controlled substances from another registrant or law enforcement for the purpose of: (1) Return to the registered manufacturer or another registrant authorized by the manufacturer to accept returns on the manufacturer's behalf; or (2) Destruction." 21 CFR § 1300.01.

iii.    He used two particular reverse distributors, which he named, to destroy all Schedule II through V controlled substances.[12]

Accordingly, SCHIRRIPA again represented that he had sold, returned, or destroyed all controlled substances.  As explained below, I believe this, too, was a deliberately false statement.

e.    At this meeting, SCHIRRIPA surrendered his DEA registration for cause.[13]

f.    In light of SCHIRRIPA's representations and the surrender of his DEA registration, DEA closed its investigation of him and MAP at that time.

## The April 10, 2020 Search of SCHIRRIPA's House

35.    As noted above, RICHARD SCHIRRIPA, the defendant, voluntarily spoke with law enforcement agents on April 10, 2020. During that interview, SCHIRRIPA told agents in sum and substance, and among other things, that the safe in the basement of SCHIRRIPA's House had narcotics in it that needed to be destroyed.

36.    As noted above, based on my involvement in this investigation, including my participation in the execution of the judicially authorized search warrant of SCHIRRIPA's House, I am aware that, among other things, various controlled substances were found inside of a safe in the basement, including fentanyl patches, oxycodone,    oxymorphone,    morphine    sulfate,    hydromorphone, dextroamphetamine, methadone, concerta, clonazepam, zolpidem, nucynta, and vyvanse.  In total, there were at least approximately 3,958 patches/pills in this safe.  Based on my training, experience, and research, I am aware that each of these controlled substances is federally scheduled and that various of these substances are either pain medication, attention-related medication, or anxiety-related medication for which there is a substantial illicit market.

---

[12] There is no accepted medical use for a Schedule I substance, such as heroin or cocaine.

[13] SCHIRRIPA also signed a "Surrender for Cause of DEA Certificate of Registration," in which he acknowledged his "alleged failure to comply with the Federal requirements pertaining to controlled substances or list 1 chemicals."

23

37. As part of my involvement in this investigation, I examined the labels on these prescription bottles; most, but not all, of the bottles contained such labels. These labels stated that the prescriptions were filled at MAP between 2012 and 2019. These labels contained at least approximately 25 different patient names; none of these labels had the name of RICHARD SCHIRRIPA, the defendant, or any of SCHIRRIPA's cohabitants, as the patient for whom the pills/patches were prescribed.[14]

38. These labels also set forth various quantities of pills. Based on the sums set forth in these labels, there should have been approximately 4,969 pills/patches in these bottles of pills/boxes of patches. Instead, as noted, the actual quantity was only 3,958 pills/patches -- revealing that more than approximately 1,000 were missing.[15]

39. There were also a number of prescriptions that were completely filled (i.e., no pills were missing), including, among others, two recent prescriptions: (1) a prescription of 240 pills of Oxycodone/APAP 10-325, dated September 9, 2019 -- the same day that SCHIRRIPA stated that MAP closed all operations; and (2) a prescription for 60 pills of Vyvanse, dated August 6, 2019.

40. Based on the foregoing, I believe that defendant RICHARD SCHIRRIPA's representations to the DEA in January and February 2020 were deliberately false. He stated, both verbally and in writing, that he had transferred, sold, or destroyed (through a reverse distributor) all controlled substances. In fact, he had thousands of pills/patches in his downstairs safe, as he admitted on April 10, 2020.[16]

---

[14] On a few labels, the name of the patient had been scratched out.

[15] Some, but not all, of the prescription bottles with "missing" pills contained a hand-written notation consisting of a slash over the printed quantity, and a hand-written number that was lower than the printed number.

[16] Based on my review of DEA laboratory test results, I am aware that the DEA has conducted laboratory tests to date of two of the various substances seized from SCHIRRIPA's House on April 10, 2020. Both substances tested positive for the presence of the controlled substance listed on their respective label -- fentanyl in one case, and oxycodone in the other.

## SCHIRRIPA'S HEALTH CARE FRAUD SCHEME

Interviews of Twelve Individuals Whose Names Appear on the
Labels of Controlled Substances Seized from SCHIRRIPA's House

41. Based on my involvement in this investigation, including
my participation in various patient interviews, I am aware that,
during the week of May 11, 2020, law enforcement conducted
interviews, both in-person and by telephone, of approximately
twelve individuals whose names appear on the labels of controlled
substances seized from SCHIRRIPA's House on or about April 10,
2020. In sum and substance and in part, these twelve individuals
stated the following:

a. All twelve individuals had no idea why someone else
would be in possession of their prescription.

b. The majority recalled filling prescriptions at MAP.

c. The majority paid for their prescriptions through
Medicare or Medicaid.

d. Eleven of twelve individuals always picked up their
prescriptions (either from MAP or generally), or had a relative do
so. The tenth individual sometimes did not pick up his
prescriptions from MAP, due to his lack of funds.

e. Ten of twelve individuals had never returned a
prescription to MAP, and an eleventh believed she had never done
so. The twelfth individual did not recall; he said he might have
once taken back an oxycodone prescription after using
approximately five pills and determining it was the wrong
prescription.

f. Based on my training, experience, and involvement
in this investigation, including my conversations with DEA
employees, I believe that RICHARD SCHIRRIPA, a/k/a "the Mask Man,"
the defendant, was filling prescriptions (or causing prescriptions
to be filled) in the names of MAP's patients, without those
patients' consent.

### Four Particular Patients

42. Based on my involvement in this investigation --
including my review of MAP's records, my analysis of labels on the
controlled substances seized from SCHIRRIPA's House on April 10,
2020, my conversations with a DEA Special Agent, and my review of

25

data provided by the U.S. Department of Health and Human Services ("HHS") -- I am aware of the following, among other things:

### Patient-1

a.      A significant majority of the controlled substances seized from SCHIRRIPA's House on April 10, 2020 contained labels with purported patient information.  On a few of those labels, however, the purported patient's name was scratched out.  In at least one of these instances -- "Tampered Label-1" -- the other information on the label remained visible, including the patient's Brooklyn, New York address; the type of controlled substance (Oxycodone); the quantity of pills printed on the label (120); the prescription number ("Rx Number-1"); the date on which the prescription was filled (July 16, 2019); the prescribing physician; and the pharmacy that filled the prescription (MAP).

b.      MAP records contain prescription records for Rx Number-1, which is associated with a particular patient ("Patient-1"), and the same drug information described in the prior paragraph (i.e., 120 pills of Oxycodone, filled on July 16, 2019).[17]

c.      Patient-1's information was supplied to HHS.  HHS supplied records confirming that, on or about July 16, 2019, MAP billed Medicare for the prescription associated with Tampered Label-1 -- i.e., the prescription for Patient-1, which had Rx Number-1 on the label, and which consisted of 120 pills of Oxycodone, and was filled on or about July 16, 2019.  Medicare paid at least approximately $31.28 for this Oxycodone prescription.[18]

d.      On or about April 10, 2020, agents found this particular prescription of Oxycodone in SCHIRRIPA's House; 25 pills remained, and 95 pills were missing.

e.      On or about May 14, 2020, Patient-1 was interviewed by law enforcement and stated the following, in sum and substance and in part:

---

[17] Based on my review of publicly available information, I am aware that every prescription in New York State is assigned a unique prescription number.

[18] The Medicare program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS.

     i. She used to fill prescriptions at MAP approximately once per month, but had not done so for some time; when MAP closed, they transferred their prescriptions to Walgreens.

     ii. She had Medicare.

     iii. She never took back a prescription to MAP.

     iv. She once had someone else pick up her prescription when she had just had surgery, but MAP did not otherwise allow it.

     v. There was no reason a prescription in her name should end up in anyone else's home.

### *Patient-2*

    f. Similarly, on another label, the purported patient's name was scratched out -- "Tampered Label-2" -- but the other information on the label remained visible, including the patient's Wayne, New Jersey address; the type of controlled substance (Vyvanse); the quantity of pills printed on the label (60); the prescription number ("Rx Number-2"); the date on which the prescription was filled (August 6, 2019); the prescribing physician; and the pharmacy that filled the prescription (MAP).

    g. MAP records contain prescription records for Rx Number-2, which is associated with a particular patient ("Patient-2"), and the same drug information described in the prior paragraph.

    h. On or about April 10, 2020, agents found this particular prescription of Vyvanse in SCHIRRIPA's House; all 60 pills remained.

    i. On or about May 14, 2020, Patient-2 was interviewed by law enforcement and stated the following, in sum and substance and in part:

     i. She had infrequently filled prescriptions at MAP; it had been at least one year, and perhaps more, since she had done so.

     ii. She paid for prescriptions through her employer health insurance, not Medicare or Medicaid.

27

iii.   There is no reason a prescription in her name would end up in someone else's home.

iv.   She never had a prescription denied at MAP, and she never brought back a prescription to MAP.

### Patient-3

j.   Two of the prescriptions seized from SCHIRRIPA's House on April 10, 2020 were purportedly for a particular patient who lived in New York, New York ("Patient-3").   These two prescriptions -- respectively dated on or about November 5, 2014 and January 6, 2015 -- were each for approximately 60 pills of Oxymorphone ER 40mg.  Both prescriptions were filled at MAP.

k.   HHS supplied records confirming that, on or about November 5, 2014 and January 6, 2015, respectively, MAP billed Medicaid, which paid a total of approximately $1,043.80 for these prescriptions.[19]

l.   Both pill bottles containing Patient-3's name had missing pills, at the time they were found at SCHIRRIPA's House; one bottle was missing 50 pills, the other 30.

m.   Agents interviewed Patient-3 on or about May 11, 2020.  Patient-3 stated, in sum and substance and in part, that:

i.   He always picked up his prescriptions from MAP;

ii.   He had never returned a prescription to MAP; and

iii.   He had no idea how a prescription with his name could end up in someone else's possession.

---

[19] The New York State Medicaid program ("Medicaid") is a federal and state health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain others who lack adequate resources to pay for medical care.   CMS oversees Medicaid as well as Medicaid programs in participating states.  CMS provides substantial funds to New York State for the Medicaid program.

28

*Patient-4*

n.     One of the prescriptions seized from SCHIRRIPA's House on April 10, 2020 was purportedly for a particular patient who lived in New York, New York ("Patient-4"). This prescription, dated on or about July 28, 2014, was for approximately ten PT7 fentanyl 75mcg patches. This prescription was filled at MAP.

o.     HHS supplied records confirming that, on or about July 28, 2014, MAP billed Medicaid, which paid approximately $145.01 for this prescription.

p.     The box of fentanyl patches containing Patient-4's name had two missing patches, at the time it was found at SCHIRRIPA's House.

q.     Agents were unable to interview Patient-4, as she had passed away.

43.     Based on the foregoing, I respectfully submit that there is probable cause to believe that RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, fraudulently billed Medicare and Medicaid for controlled substance prescriptions and represented that those prescriptions were for individual patients of SCHIRRIPA's pharmacy, when in fact, SCHIRRIPA had those prescriptions filled for himself and possessed those prescriptions at his home in Long Island.[20]

---

[20] Based on my conversation with a DEA Diversion Investigator, I know that (1) DEA authorization is required for a pharmacist to receive "take-backs" from patients (*i.e.*, when a patient hands in an old or partially used prescription), *see* 21 CFR § 1317.40, and (2) between 1989 and 2020, SCHIRRIPA was never authorized to receive "take-backs".

WHEREFORE, I respectfully request that an arrest warrant be issued for RICHARD SCHIRRIPA, a/k/a "the Mask Man," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

s/Matthew Macchiaroli by
KNF, USMJ
 MATTHEW MACCHIAROLI
Special Agent
Homeland Security Investigations

Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this 21st day of May, 2020

Kevin Grathaniel Fox

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK